# DECISIONS

# Supreme Court of Florida,

AT

# JANUARY TERM, 1854,

## HELD AT TALLAHASSEE.

---

DANIEL LADD, APPELLANT, vs. THOMAS B. CHAIRES AND
JAMES L. TOMPKINS, APPELLEES.

Misrepresentation in a material point, innocently made, will vitiate a contract, and
be ground for setting it aside, or giving compensation to the extent of
the mistake.

This was an appeal from a decree of the Circuit Court of
the Middle Circuit for Leon County, Hon. J. Wayles Ba-
ker presiding.

The appellees, who were complainants below, filed their
bill, alleging that they applied to the appellant to purchase
three eighths of land in Wakulla County ; that the appel-
lant agreed to sell said land to them, but stated that with
these three eighths they must also purchase another eighth
immediately adjoining, the title to which he held ; that
appellees objected to the taking of this additional eighth,
but appellant representing that said eighth was attached

to the other eighths by a title that made it necessary to sell them all together, they were finally induced to include this additional eighth in the bargain. They further allege that this additional eighth was not desired by them for the purpose that moved them to the purchase, and that but for the representations of said appellant, they would not have included it in their purchase; that appellant, after entering into the contract for the sale of said land, and after having given bond for titles to the same, in order to obtain a title to said addtional eighth, entered the same at the U. S. Land Office at Tallahassee; that as soon as it was ascertained by appellees that appellant had no title to said additional eighth, except that acquired as aforesaid from the United States, they remonstrated with him upon the manner in which he had induced them, against their will and wishes, to include said additional eighth in their purchase, and at the same time proposed either that they should not be required to take said tract at all, or that said appellant should, in good faith, let them have it at the price it cost him, both of which propositions he declined. They charge that, under the facts and circumstances, it would be a fraud upon them to require them to pay the full amount agreed upon, and that it would be aiding appellant, against good conscience and fair dealing, to take advantage of his own wrong.

The bill further alleges that in the bond for title given by said appellant, there is included a small tract of land on which was a valuable mill seat, but to which appellant could make no title, the same being the property of other parties; that as it was not intended to include this tract in the purchase, appellees procured an endorsement to be made on said bond, after its delivery, excluding said tract from its operation; but they claim that it is not binding in law upon them. Nevertheless, they are not disposed to

avail themselves of this mistake, and are willing to release appellant from so much of the bond as pertains to said parcel of land, but insist that they cannot be required to do so save in a Court of Equity, and they submit that before such relief would be granted, the Court would require appellant to do equity, by allowing an abatement equal to the difference between the contract price of said additional eighth, and the amount paid for it at the U. S. Land Office. The bill concludes with a prayer that the contract be reformed so as to require the appellant to execute titles to all said lands, excepting the mill seat parcel, upon his being paid the amount of the purchase money, less the difference between the contract price of said additional eighth and the amount paid for it by appellant at the U. S. Land Office.

The appellant, in his answer, states that he did represent that he was authorized to sell all said lands, for the benefit of J. and N. Hamlin, who had held the title, and were largely indebted to him, and desired him to sell the lands for their benefit. To this end, they had made a deed to appellant, conveying said lands to him, with a view to enable him to make sale of them; that in the negotiations for their sale, he was governed by a map in his possession, prepared by N. Hamlin for his private use, which represented all the lands included in the aforesaid bond for titles as the property of J. and N. Hamlin; that N. Hamlin was and is a man remarkable for accuracy in all business transactions, and especially in matters of this nature, inasmuch as he was a practical Surveyor, and well acquainted with all the country in and about and including the lands referred to; that appellant was ignorant at the time that the title to the additional eighth was in the United States, and acted in good faith in all his negotiations; that some time after the execution of his bond for titles, he

ascertained to his surprise that the title to this additional eighth was in the United States, and that therefore, to enable him to convey the same, he entered it at the U. S. Land Office.

The appellant, in his answer, further alleged that two eighths of the land were intersected by the St. Mark's River, and were deemed valuable in consequence mainly of the water power and privilege which appertained to the same; that the object and design of the appellees was, as commonly understood, to erect a factory upon part of these lands; that these lands had been held by the Hamlins at ten dollars per acre, and only through the agency of appellant could appellees have effected a purchase on the favorable terms agreed on; that he refused to sell the two eighths upon the river without including the eighth not so intersected, because, in point of fact, the outside eighths were worth nothing, except in connection with the others; that appellees did propose to exclude one of the eighths from the contract, and pay him for the remainder, and that he refused to accede to such a proposition because he was ready to comply with his contract in good faith, and because the eighth objected to was not worth an equal proportion of the purchase money, and because appellant could, at the time of the sale, have sold the lands at the same price to other persons, and because, also, the accident with reference to the title to the additional eighth resulted in no damage to appellees, and furnished no ground for any complaint on their part.

The principal facts stated in the bill and answer were admitted to be true by the parties, and the Circuit Court pronounced a decree in conformity to the prayer of the bill, from which appellant took an appeal to this Court.

*James T. Archer* for Appellant.

*Mariano D. Papy* for Appellees.

BALTZELL, C. J., delivered the Opinion of the Court.

The contest in this case arises from an alleged misrepresentation in the sale of a tract of land. Complainants, Tompkins and Chaires, assert that they made application to Ladd for the purchase of a tract of land containing 240 acres, which he expressed a willingness to sell, but insisted upon their taking with it a tract of eighty acres adjoining, which he said he owned. This they objected to, alleging that it is not suited to the objects they had in view —the erection of a mill and factory. Ladd insisted on the sale of the entire tract, and refused to sell unless the whole was taken; that they purchased, under these circumstances, and afterwards finding that he was not the owner, as he had represented, of this 80 acre tract, they applied for an abatement of the price on the last note remaining unpaid, and he refusing, their application is now to a Court of Equity, for relief. The Court below sustained the bill, and decreed in their favor, from which Ladd has appealed to this Court.

It is distinctly admitted that Ladd represented himself authorized to sell the contested eighth, being described by a map in his possession, prepared by a former proprietor, whose accuracy he had reason to confide in, and that it did not belong to him. After discovering this fact, he bought the land, and insists on their taking it agreeably to the bargain. He resists their claim for release on the ground of their having sustained no damage or injury, and that the subject in contest was not material or essential to the agreement. We do not think the latter objection comes with propriety from a party who made the sale of this tract the turning point of the bargain, in express terms—complainants being told he would not sell any unless the entire tract

was sold.   It was to buy this with the other, or buy none. If not material, why insist upon this condition to the sale ? The only motive we can conceive, was to prevent the loss of the 80 acre tract, which might be the case if the other part was sold without it.   We can regard the sale of this tract as immaterial and indifferent only on the supposition that defendant could have got as much without its sale as with it, which is not very likely, considering that the whole tract was sold at five dollars per acre.   The price of the 240 acre tract, upon that supposition, would have been $6.66 per acre, and the price of the former proprietor, who held it at $10 per acre, would have been $13.33 per acre for the 240 acres, which we must presume he would have asked, if not the owner of the 80 acre tract.   So that we think the addition of this tract must have been regarded as essential and material by the parties in framing their contract.   A mistake, then, having been made, of a material character, in the formation of the contract, the question arises as to its effect in point of law.

"Where there is an error in the thing for which an individual bargains, by the general rules of contracting the contract is null, as in such cases the parties are not to be supposed to have given their assent."  1 Fonb. Eq., 114; Allen vs. Hammond, 11 Peters, 72.

" Contracts made in mutual error, under circumstances material to their character and consequences, seem, on general principles, invalid."   1 Story Eq., 154.

The same principle will apply to all other cases where the parties mutually bargain for and upon the supposition of an existing right.   Ibid., 164, § 143 ; Hitchcock vs. Giddings, 4 Price, 125.

The case in 11 Peter's Supreme Court reports illustrates the rule.   There the parties bargained for the collection of a claim vs. the Portuguese government, and under the ex-

pectation that very great expense, trouble and delay would attend the business, a very extraordinary compensation was agreed upon. It turned out that the claim was allowed eight days before the agreement, though unknown to the parties. The Court say: "The contract was entered into through the mistake of both parties ; it imposes great hardship and injustice on the appellee, and is without consideration." Nevertheless they allowed him compensation for services rendered. Mr. Webster, one of the counsel, puts the doctrine, with great force, in this language : "Where a fact of leading importance to parties entering into a contract was supposed to exist, and did not exist, the contract formed in the belief that it was in existence, should be set aside." P. 68.

The rule applies to cases of purchases where the parties have been innocently misled under a mutual mistake as to the extent of the thing sold. 1 Story, 166, § 144.

In the present case, Ladd no doubt was under the honest and sincere conviction that he was the owner of the eighty acres, and acting on that belief, it was not improper for him to treat it as his, by making it the subject of sale. With a knowledge of the fact that he was not owner, it would have been improper for him to represent himself as such, and a contract so made would be regarded as fraudulent. Having induced complainants to bargain with him, under an impression discovered afterwards to be false, can he hope to hold them to the agreement ? We think not. If no agreement as to this tract was originally made, as we have seen by the authorities was clearly the case, it was not for Ladd, by a change of his position, to give validity to it. This would be to make a new bargain ; to allow him to contract for them. But this cannot be. The error was his, and his must be the loss, according to every principle of right and propriety. We have alluded to ca-

ses in which the contract was rescinded on account of the mistake. This is not asked by complainants. Indeed, it is questionable whether they would be entitled to it, as they got what was the main object of their contract—the site on the river, and the land they bargained for and desired to buy.

The party may be relieved on the principles of compensation, which is thus explained : " Where there are no *indicia* of fraud, and the misdescription goes only to part of the estate, and is of such a nature as not to prejudice the full enjoyment of the residue, or the objects the purchaser, had especially in view in making the purchase, then the Court will .enforce the contract, with compensation." Atkinson on Titles, 100.

In our view the agreement must be regarded as if the eighty acre tract had not formed part of the sale, and the 240 acres had been sold without it. This would have been the case if there had been no mistake as to the ownership.

An abatement of the price should then be made to the extent this tract entered into the consideration agreed to be paid. This is the damage complainants would sustain if compelled to pay for the whole tract. Although the rate was five dollars per acre, we by no means conceive that this should be the rate of deduction. The tract containing the site was the one of value, and the eighty acre tract comparatively of much less value. So far as its addition extended the price that would have been given for the other tract, if it can be ascertained, the complainants are entitled to have a credit for on their note. We do not perceive in the record the materials for ascertaining it. Possibly it may be done through means of a Master, to whom the matter may be referred by the Court below, with-power to call for the estimates and papers, and examine the parties and witnesses.

The Court below, concurring in disaffirming the sale of the contested eighth, allowed the difference between $1.25, the price paid for it per acre, and $5, with directions that title should be made to them for the entire tract. We are of opinion that complainants are under no obligation to take it, and should not be compelled to do so by decree of the Court.

Complainants insisted that the contract as to this eighth was illegal and invalid, on account of champerty. We think they are not entitled to raise this question; for giving judgment at law by consent, they reserved their equitable rights. If this defence be available, it is legal, and not equitable.

The decree of the Court below will be affirmed so far as it declares the contract invalid as to the eighty acres, but will be reversed and set aside so far as it directs title to be made thereto, and fixed the damage at the sum of $300.

And the said Court will proceed to appoint a Master, whose duty it shall be to proceed, in conformity with this opinion, to ascertain, as near as may be, the sum or amount for which a deduction should be made from the contract price of the land sold in consequence of the addition of the 80 acres, with power to call for estimates and papers, and examine the parties and witnesses, and for such other proceedings as may not be inconsistent with this opinion, and the rules and principles of equity and justice.

DuPONT, J., delivered the following dissenting opinion:

I concur with a majority of the Court in overruling the decision in this cause pronounced by the Chancellor in the Court below, but dissent from so much of the order as directs the case to be sent back for further proceedings.

It is admitted by the defendant below that he did make a misrepresentation in regard to his ownership of the land

in controversy, at the time of and during the treaty for the sale to the complainants; but he expressly states in his answer that this misrepresentation was the result of an innocent mistake, and there is no charge or pretence in the bill that he *meditated* any fraud in the transaction. "Mistake" is one of the well defined and admitted grounds of Equity jurisdiction, but it is not every mistake of fact that will induce the equitable interference of the Court. The doctrine upon this subject is so lucidly stated by Story, in his admirable Treatise on Equity Jurisprudence, that it seems impossible to mistake it. He says: "The rule as to ignorance or mistake of facts entitling the party to relief, has this important qualification, that *the fact must be material to the act or contract;* that is, that it must be essential to its character, and an efficient cause of its concoction. For though there may be an accidental ignorance or mistake of a fact, yet if the act or contract is not *materially* affected by it, the party claiming relief will be denied it." Story Eq. Ju., §141, 5.

Applying the rule to the facts in this case, the question arises, what was the fact in reference to which the mistake occurred? The allegation and admission is that Ladd represented himself to be the owner of the eighth of land in controversy, when in fact and in truth the title was in the government. Was the mere fact as to *who held the title* at the time of the treaty, a matter "material" to or the "efficient cause" of the contract? It would seem not, for the purchasers took good care to provide against a *failure of title*, by taking the covenant of the vendor to perfect the same, and he is now able and ready to comply with that covenant. Wherein, then, consists the "*materiality*" of the mistake? I am at a loss to perceive. It certainly did not affect the value of the purchase, for it is strongly intimated in the bill, if not expressed in so ma-

ny words, that the particular eighth of land in controversy was wholly valueless. Now, upon the subject of "*materiality*," I take the rule of equity to be this : that no misrepresentation or mistake of fact will be deemed "*mateal*" which does not affect the *value* of the thing contracted for. The representation that he had the title to this particular eighth, was doubtless a potent argument in the mouth of Ladd why he would not consent to separate it from the other three; but as a matter of argument merely, I do not think it comes up to the rule. At most, it can only be received as "*damnum absque injuria*," and equity never interposes except to remedy or prevent injury. Story Eq. Jur., §151; 2 Bibb, 474, Crittenden vs. Craig.

But the rule of equity proceeds further, and sometimes refuses its interference even where the mistake is of a *material* fact. This occurs when there has been a strict observance of perfect good faith between the parties, and the mistake complained of is the mistake of all. Story Eq. Ju., §147 ; Fonb. Eq., Chap. 2, §7, (note v.)

"Where the mistake is not the occasion of the promise, the act is valid, there being nothing wanting of the true assent on all sides." 2 Pow. on Con., 263.

I can discover nothing in the facts of this case which calls for the interference of a Court of Equity. A vendor, supposing himself to be the owner of a tract of land, contracts to sell the same, and executes a covenant to perfect the title. He afterwards discovers that he was mistaken as to his ownership, and that the title is in fact in another. He forthwith purchases the title, and thus puts himself in a position to comply with his covenant, and it is now claimed that instead of thus acting, he ought to have communicated the fact to the vendees, and left it to their option to have rescinded the contract. I do not think he was bound by any principle of equity or good morals voluntarily to

place himself within the power and consequently at the mercy of the vendees, who held his covenant for title, and might, upon a demand or refusal, have proceeded against him for damages, in a Court of Law, or for a specific performance in a Court of Equity. In cases where there appears no meditated fraud, equity is as observant of the mutuality of *rights* in the enforcement of contracts, as it is of the mutuality of *assent* in their concoction, and a very simple *test* of the principle involved in this controversy is this : Might the vendor have been compelled to respond in damages for a non-compliance with his covenant for title ? Evidently he might. If, then, he might have been thus compelled, I am at a loss to discover the principle upon which it can be ruled to be *iniquitous* in him to place himself in a position to make good his legal *obligation*. The vendees are now tendered all they contracted for—the title—and with that I think they ought to be satisfied. ·

I am the more decided in my dissent in this cause because of the apprehension that by making the Courts of Equity Jurisdiction too easily accessible, parties may be induced to abate that vigilance and caution in the concoction of their contracts, which affords the surest guarantee against litigation. Whilst Courts of equity should be ever open to rebuke *fraud* in all its aspects, they should nevertheless be careful not to encourage *negligence* by a too ready interference in the business transactions of individuals. Pothier has expounded this subject with his usual force and sterling sense, and given to us a well defined line of demarkation. " As a matter of conscience," says he, " any deviation from the most exact and scrupulous sincerity, is repugnant to the good faith that ought to prevail in contracts. But in civil tribunals, a person cannot be allowed to complain of trifling deviations from good faith in the party with

whom he has contracted.  Nothing but what is plainly injurious to good faith ought to be there considered as a fraud sufficient to impeach a contract."  With how much greater force is this doctrine applicable to a mere *mistake of fact*, unaccompanied by any pretence of fraud.  I am of opinion that the facts of this case do not afford sufficient ground for the interference of equity, and therefore think that the bill ought to have been dismissed.